[No. E009799. Fourth Dist., Div. Two. Nov. 17, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
CARL BARTLETT JONES II, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III-B, III-C-2-(b), (c), and (d).

**COUNSEL**

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly Wilkens and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TIMLIN, Acting P. J.—**

### I.

### INTRODUCTION

Carl Bartlett Jones II (defendant) was convicted by a jury of violating Penal Code section 288.5 (continuous sexual abuse of a child)[1] and certain special allegations were found true. Further, a sentence enhancement allegation pursuant to section 667—defendant having been previously convicted of a prior serious felony, namely, the crime of forcible oral copulation with a person under 14 years of age (§ 288a, subd. (c))—was admitted by defendant and found true. He was sentenced to the upper term of 16 years in state prison, based on the conviction, and an additional 5 years for the sentence enhancement, the aggregate total prison term being 21 years.

Defendant contends on appeal that the judgment must be reversed because the jury was instructed, pursuant to CALJIC No. 2.20.1, that it "should disregard the fact that because of age and the level of cognitive development a child may perform differently as a witness from an adult," and this instruction foreclosed the jury's independent consideration of the child witness's credibility. He also contends that even if the judgment is not reversed, the cause must be remanded for resentencing, because: (1) the victim and her brother, a percipient witness of the sexual assaults on the victim, were allowed to "recommend" the sentence defendant should receive; (2) the trial court relied upon several improper aggravating factors when it imposed the upper term of 16 years; and (3) the trial court failed to exercise its discretion when it imposed the upper term.

### II.

### FACTS

Defendant is the biological father of T. and J. He and the children's mother (mother) were married in 1978, and their divorce became final in 1982. For approximately eight years and since T. was an infant and J. was about two years old he had not seen the children. In that interim, T. and J. lived with their mother, stepfather Doug (stepfather), whom mother had married in 1985, when T. was four years old, and siblings and stepsiblings Sarah, Lonnie, and Timothy.

---

[1]All further statutory references shall be to the Penal Code unless otherwise stated.

In January 1990, when T. was eight and J. was ten, defendant, through his sister Charmane, asked mother if he could reestablish contact with T. and J. Mother agreed, and about a week later, he visited them at their home, in mother's presence. Defendant was accompanied by "David," a member of the commune where defendant was then living. His sister Charmane also came for the visit, but arrived separately and left before defendant did. At that time, stepfather was not living in the family home in Desert Hot Springs, but was in San Diego, looking for work.

Defendant expressed the desire to see the children again, and made arrangements for mother, T., J., and one of the other children to spend the weekend with him at the religious commune's ranch.

After this weekend visit, defendant again visited T. and J. at their home, accompanied by Charmane. Defendant and Charmane asked if they could take the children to buy them some shoes. Mother agreed, and defendant left with the children.

Defendant did not take the children to buy shoes, but instead took them back to the ranch, where he promptly began to subject T. to a variety of sexual acts, which she testified occurred on every day except one that she was at the ranch. J. witnessed many of these acts, and defendant threatened him with unspecified consequences if he told what he had seen. J. testified that he was afraid to tell any of the adults at the ranch what was happening, because they appeared to be defendant's friends, and he was afraid they would tell defendant if he went to them for help. T. testified she was afraid they would be kicked out, and would have nowhere to live if she told the other adults what was happening to her. The children's ability to seek outside help was impaired because there was only one pay telephone on the entire ranch.

Mother called the ranch when the children did not return from the supposed shoe-buying expedition, but was unable to make any contact with defendant or the children. She then contacted the police, who told her that her custody papers were out-of-date and that she needed to get new ones. About a week after T. and J. were taken, mother noticed that some of their clothing was missing from the house, and one of the other children told her that someone had come during the day while she was out and had taken the clothes. David Lee Smith, who lived at the commune, testified in contrast that mother gave them the clothes to take.

With the support of the religious commune, defendant initiated legal proceedings to obtain legal and physical custody of the children. Mother was

served with court papers to this effect about three weeks after the children were taken by defendant. Mother went to court on four separate occasions, but was not able to obtain an order that T. and J. be released to her custody until June 7, 1990, which was four months after defendant took physical custody of the children. She then went to the ranch, accompanied by stepfather and Deputy Sheriff Bradley, to take custody of the children. During the transfer of the children's physical custody to mother, T. told mother that defendant had touched her private parts. Stepfather asked J. if he was okay and if anything had happened to him. At this point, J. told stepfather that defendant had molested T. Stepfather apparently passed this information on to Deputy Bradley, who attempted to question first T. and then J., but to no avail, as neither child would speak to him.[2] Bradley decided there was not enough information to warrant making a report. He then told mother she should take T. to a doctor for a physical exam, and that she should contact him if the examination indicated that there had been sexual abuse.

T. was examined in the company of her mother by Dr. Bronwen Anders on June 13. Dr. Anders received a history of possible sexual molestation from Dominique Cattaneo, a social worker who had interviewed T. According to Dr. Anders, the physical condition of T.'s rectum was "strongly suggestive" of sodomy and the physical condition of her genital area was suggestive of attempted penile or digital penetration, which she opined could have occurred from three days to one year before the physical examination. She also discovered that T. had venereal warts, which had probably been contracted as a result of sexual abuse within the past four months. These warts spread very quickly, required extensive surgery to remove and, due to the drastic increase in the warts after the exam, it was her opinion that T. had contracted the warts shortly before the exam.

Detective Waltz of the Riverside Sheriff's Department interviewed both children on June 29. During this interview, T. said defendant's penis was covered with pimple- or wart-like spots. According to J., he told Waltz the whole story of what happened.

Defendant's defense was that mother had asked him to take the children because she could not care for them because of health problems, and that T. had been sexually abused by someone else. In support of this assertion, he presented the testimony of the ranch's religious leader, who testified that T. had told her that mother's boyfriend or boyfriends had molested her. T. in her trial testimony denied making such a statement and denied being molested by anyone except defendant.

---

[2] J. testified he told Bradley what he had told stepfather, but that he did not tell him the whole story.

Defendant also presented testimony from another member of the commune, who had lived with defendant and the children as their assigned "housekeeper" during the last portion of the children's stay at the ranch. This evidence was intended to show that defendant had not had sufficient unobservable access to T. for the purpose of molestation, which T. had described as occurring every day except one during her stay at the ranch. However, the housekeeper testified that she also was charged with the task of patrolling the ranch at night to make sure a 9 p.m. curfew was being observed by ranch occupants. T. had testified that defendant's molestations of her occurred during the daily two-hour period that the housekeeper was checking for curfew violations.

## III.

### DISCUSSION

A. *The trial court did not err by instructing the jury pursuant to CALJIC No. 2.20.1.*

■ Defendant asks us to reconsider our decision in *People* v. *Harlan* (1990) 222 Cal.App.3d 439 [271 Cal.Rptr. 653] (agreed with in *People* v. *Gilbert* (1992) 5 Cal.App.4th 1372, 1393 [7 Cal.Rptr.2d 660]) in which we held that the trial court did not err by instructing the jury, pursuant to CALJIC No. 2.20.1:

"In evaluating the testimony of a child [10 years of age or younger] you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. Although, because of age and level of cognitive development, a child may perform differently as a witness from an adult, that does not mean that a child is any more or less credible a witness than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child. [¶] 'Cognitive' means the child's ability to perceive, to understand, to remember, and to communicate any matter about which the child has knowledge."

Defendant argues that the second sentence of CALJIC No. 2.20.1 "forecloses independent jury consideration of the credibility of a child witness." We rejected this same argument in *People* v. *Harlan, supra,* 222 Cal.App.3d 439. Defendant contends that *Harlan*'s analysis is flawed, because in *Harlan* we held that the use of the word "perform" in the second sentence of CALJIC No. 2.20.1 implies nonverbal action, and that this sentence merely advises the jury that due to the age and level of cognitive development, a

child may act differently on the witness stand than an adult, and does not relate to the truth or falsity of the content of the child's testimony. According to defendant, a layperson would understand the word "perform" to mean not only the witness's demeanor, but the *credibility* of his or her testimony, i.e., how the words are spoken and "whether they ring true," because the definition of "perform" is to enact a role, and acting includes the spoken word as well as nonverbal cues.

Our opinion that the use of the word "perform" in the second sentence implies nonverbal action, and that due to a child's age and level of cognitive development, his or her action on the witness stand may be different than the action of an adult on the witness stand, does not preclude a jury from considering how the child witness's testimony is spoken. The act of speaking, including voice sound, articulation, inflection, intonation and other speech characteristics, is nonverbal action as opposed to the content of the speech, i.e., the word message conveyed by the act of speaking. "Verbal" is defined as relating to or consisting in or having to do with words. (Webster's Third New Internat. Dict. (1964) p. 2542.) In contrast, "nonverbal" does not relate to or consist of words. The statement in *Harlan* that "perform" implies nonverbal action in the context of CALJIC No. 2.20.1 refers to the manner of speaking, not the spoken words.

It is difficult for us to fathom how jurors could understand that "perform" as used in the second sentence of CALJIC No. 2.20.1 advises them to consider the *words* of a child witness "to ring true(r)" than the words of an adult witness. "Ringing true" is a colloquial expression for believability. Defendant's reference to believability of words reaches the issue of whether the testimony, i.e., spoken words, is believable. CALJIC No. 2.20, which was given in this case, clearly advises the jury about the factors for gauging credibility, i.e., the truth of the spoken words. The instruction refers to a witness's demeanor, i.e., behavior (nonverbal action) on the witness stand. As the People point out, the second sentence of CALJIC No. 2.20.1 merely informs the jurors that due to age and cognitive development, a child witness may behave differently than an adult witness on the stand and such behavior includes *how* he or she speaks, i.e., delivers words to an audience (the jury).

The word "perform" does not connote or direct the jury to apply the factor of demeanor in assessing credibility differently to a child witness than it would to an adult witness. The second sentence of CALJIC No. 2.20.1, which is the sole basis for defendant's challenge, does not instruct the jury that because a child "performs" differently on the witness stand, he or she for that reason alone is more credible than a nonchild witness. As we stated in *Harlan*, the second sentence, including the word "perform," ". . . refers

to one of many factors to be applied by a jury in determining a [child] witness's credibility, namely, the demeanor and manner of the witness while testifying. [Citation.]" (222 Cal.App.3d at p. 455.) This advice does not remove the issue of credibility from the jury; in fact, it presupposes that the jury must make a determination of credibility, but only after considering all the factors related to a child's testimony, including his demeanor, i.e., how he or she testifies on the stand, which encompasses the manner of speaking.

B. *One sentencing error requires that the cause be remanded for resentencing—the trial court failed to exercise its discretion when it imposed the upper term, and the matter must therefore be remanded for resentencing.**

. . . . . . . . . . . . . . . . . . . . . . . . .

C. *Defendant's other claimed sentencing errors*

 1. *Defendant has failed to establish that the statements made by the two children at the sentencing hearing were improper and, if so, that he was prejudiced by them.*

■ Defendant contends that T. and J. should not have been allowed "to recommend" at defendant's sentencing hearing that he be sentenced to a 21-year prison term because, pursuant to section 1191.1, victims may express their views "concerning the crime, the person responsible, and the need for restitution," but the children's "recommendation" did not fall within any of these categories of permissible viewpoints which may be expressed at a sentencing hearing.

It has been held that a defendant who fails to object to the contents of a victim's statement pursuant to section 1191.1 has waived any objection to it on appeal. (*People* v. *Birmingham* (1990) 217 Cal.App.3d 180, 183 [265 Cal.Rptr. 780]; see also *People* v. *Evans* (1983) 141 Cal.App.3d 1019, 1021 [190 Cal.Rptr. 633].) However, assuming arguendo that the doctrine of waiver does not apply under such circumstances, we would still conclude that the children's statements were within the range of permissible comment under section 1191.1.

We note that this court in the past has construed section 1191.1 liberally to reflect its understanding of the intent of the electorate when it adopted section 1191.1 as part of Proposition 8, "The Victims' Bill of Rights." In *People* v. *Zikorus* (1983) 150 Cal.App.3d 324 [197 Cal.Rptr. 509] wherein it

---

*See footnote, *ante*, page 1566.

was held that section 1191.1 did not prohibit the prosecutor and the victim's mother from making comments in regards to sentencing, we stated:

"The history of the statute, legislative debates, committee reports, or statements to the voters in the case of initiative and referendum measures, may also be considered in ascertaining legislative intent. [Citation.] To ascertain the intent of the electorate it is proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. [Citation.]

"With these principles in mind, we turn to our analysis of Penal Code section 1191.1. Penal Code section 1191.1 was adopted as part of an initiative measure, Proposition 8, by the voters of California on June 8, 1982. Proposition 8 was entitled 'The Victims' Bill of Rights.' It is clear that the main thrust of the statute was to expand the rights of victims, not to restrict the scope of judicial inquiry into sentencing alternatives. In the analysis by the Legislative Analyst which was distributed in the ballot pamphlets to all voters, the voters were told (at p. 55):

" 'Under existing law, statements of victims or next of kin are requested for various reports which are submitted to the court. In many cases, parole boards are not required to notify victims or next of kin about hearings.

" 'This measure would require that the victims of any crimes, or the next of kin of the victims if the victims have died, be notified of (1) the sentencing hearing and (2) any parole hearing (if they so request) involving persons sentenced to state prison or the Youth Authority. During the hearings, the victim, next of kin, or his or her attorney would have the right to make statements to the court or hearing board. In addition, this measure would require the court or hearing board to state whether the convicted person would pose a threat to public safety if he or she were released on probation or parole.'

" . . . . . . . . . . . . . . . . . . . . . . . . .

"We therefore conclude that Penal Code section 1191.1 was not intended to change common law and limit information a sentencing court may consider in imposing judgment. It simply guarantees to the victim a right to be heard and considered." (150 Cal.App.3d at pp. 330-332, fn. omitted.)

Given the fact that the victims in this case were nine and eleven years old at the time of the sentencing hearing, that the crime involved sexual abuse, including rape, sodomy, and oral copulation, and that it was committed by

the children's biological father, all of which facts might be expected to inhibit a detailed discussion in open court of either the crime itself or defendant, we conclude that the children's comments that they wanted defendant to go to prison for the maximum time possible, so that, according to T., he wouldn't be able to hurt other little girls, could be reasonably construed as simply a summary of their views about the crime and defendant, i.e., that it was a very serious crime, and one which defendant might well repeat, if not incarcerated, and that there was nothing related to either the crime or to defendant which would lead them to express the view that defendant deserved any clemency in regard to the maximum punishment authorized by law. (See, e.g., *People* v. *Birmingham, supra,* 217 Cal.App.3d 180, 182, in which the adult mothers of victims of child abuse expressed their views of the seriousness of the crime in terms of the length of the punishment defendant *should* receive, regardless of the statutorily authorized term.)

Furthermore, even if the children's comments did not fall within the ambit of allowable comments pursuant to section 1191.1, defendant has failed to show that he was prejudiced by their comments, i.e., he has failed to show that it is reasonably probable that he would have obtained a more favorable sentence in the absence of the children's comments. Considering the trial court's analysis of the aggravating and mitigating factors and their application to both the crime (Cal. Rules of Court, rule 421(a); hereafter all references to rules are to the California Rules of Court) and defendant individually (rule 421(b)) and its conclusion that a number of aggravating facts existed but no mitigating circumstances, we conclude beyond any reasonable doubt that defendant's sentence would not have been more lenient if the children had not made their statements.

2. *With one exception the trial court did rely on proper aggravating factors to impose the upper term.*

(a) *Use of same act to apply more than one aggravating factor.*

Defendant contends the trial court improperly used the fact of T.'s abduction by defendant as evidence of three different aggravating factors: that she was particularly vulnerable (rule 421(a)(3)), that the crime was sophisticated and premeditated (rule 421(a)(8)), and that defendant violated a position of trust (rule 421(a)(11)). While defendant has not been able to find any authority which prohibits such consideration, he argues that the court's "action is comparable to the improper dual use of aggravating factor[s] to enhance the defendant's sentence and impose the upper term."

We are not persuaded that there is anything inherently unfair about looking at one established act and the *circumstances* surrounding its commission (here, defendant's abduction of the children), and then considering whether the act and its surrounding circumstances, when analyzed, constitute one or more of the circumstances in aggravation or mitigation relating to the crime. That is exactly what the court did here. The facts of this case were not simply that defendant abducted the children. For example, defendant did not snatch the children off the street. Accepting the facts which are most favorable to the prosecution's case as being true, one would conclude that defendant lulled the victims' mother into a false sense of trust by initiating several visits before abducting the children, and by then taking the children in a manner designed to give him a head start before the mother would realize that anything was wrong, i.e., by taking them on the pretext of purchasing shoes for them. The fact that the molestation of T. began within a day or two of defendant's arrival at the ranch with the children also supports the inference that defendant's preliminary visits and the visit which culminated in the abduction were planned in advance with the goal of obtaining access to T. for the purpose of molestation. These facts supported a finding that the crime was planned and sophisticated within the meaning of rule 421(a)(8).

In addition, the fact that as a part of the abduction defendant removed the victims to an unfamiliar setting, where they were separated from their mother and stepfather, the most likely persons to whom these children might confide the fact of the molestations, supported a finding that under such circumstances the victims were particularly vulnerable, a factor of aggravation under rule 421(a)(3).

Finally, the fact that defendant was the children's biological father, so that he could defend his abduction "under color of law," so to speak, by seeking court orders to maintain the status quo regarding physical custody of T. while he continued to molest her, clearly supports the finding that defendant used a position of trust and confidence, that of a legal parent, to commit the offense, another factor of aggravation under rule 421(a)(11).

(b)-(d)*

. . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1566.

## IV.

### DISPOSITION

The judgment of conviction is affirmed but the sentence is vacated, and the case is remanded for resentencing in accordance with the views stated in this opinion.

McKinster, J., and McDaniel, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied March 18, 1993.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.