Filed 4/4/14  P. v. Serrano CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245805 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. Nos. KA095487 & KA095862) |
| PABLO SERRANO, | |
| Defendant and Appellant. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Bruce F. Marrs and Steven D. Blades, Judges.  Affirmed as modified.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

Pablo Serrano (appellant) appeals from the judgments in case Nos. KA095487 and KA095862.

In case No. KA095487, after a jury trial, he was convicted of two counts of second degree robbery (Pen. Code, § 211), each with a finding the robberies were committed for the benefit of, at the direction of or in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)).[1] Thereafter, the parties negotiated an agreement as to a plea in case No. KA095862 and as to sentencing in both cases. In KA095862, appellant plead no contest to count 2 of the information, an offense of assault with a firearm with an enhancement for the personal use of a firearm. (§§ 245, subd. (a)(2); 12022.5, subd. (a).)

As agreed, the trial court sentenced appellant in case No. KA095487 to consecutive terms of five years and of one-third the middle term of three years, or one year, for the robberies, enhanced by a 10-year term for the gang allegation, an aggregate term of 16 years. In case No. KA095862, it imposed further consecutive terms of one-third the middle term of three years, or one year, for the assault with a firearm, enhanced by a consecutive term of one-third the middle term of four years, or one year four months, for the personal use of a firearm.

The total negotiated term in state prison was 18 years four months.

## CONTENTIONS

Appellant contends he is entitled to a reversal of the judgment in case No. KA095487 as he was prevented from being present when testimony was reread to the jury during deliberations, and he made no written waiver of his presence to any proceedings concerning jury inquiries during jury deliberations. He also contends the trial court erred in calculating his section 2900.5 custody credits.

We find merit only in the latter contention.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

# BACKGROUND

Appellant makes no claim of insufficient evidence. Thus, we state only the facts pertinent to this appeal.

1. *Case No. KA095487.*

    a. *The prosecution's case-in-chief.*

        (1) *The robberies.*

At about 9:00 p.m. on August 24, 2011, Jaime M. and Steven Z. were at a Jack-in-the-Box restaurant in La Puente. Appellant and another male attempted to ride off on the youths' bicycles, which the youths had left sitting outside against one windowed wall of the restaurant. Jaime M. and Steven Z. confronted the appellant and his companion, demanding the return of the bicycles. Appellant's companion told appellant, "Pull out the shank." Appellant was sitting on Jaime M.'s bicycle and said, "Puente, homie," to Jaime M. Appellant pulled out a folding knife with a three-inch blade. Steven Z. testified that the use of the name of a local Puente gang and the display of the knife scared him, and both youths backed off.

Appellant and his companion rode off on the bicycles in two different directions. The bicycles were never recovered.

On September 9, 2011, appellant was arrested.

A Los Angeles County deputy sheriff, a gang officer, testified that appellant was a self-admitted Puente gang member and opined that the robberies were committed for the benefit of the Puente gang.

        (2) *The identification evidence.*

Jaime M. and Steven Z. got a good look at appellant prior to the robberies as appellant had been hanging around outside the Jack-in-a-Box near the bicycles for at least five minutes. While appellant was out there, he was speaking on a telephone. Shortly thereafter, appellant's companion, the other robber, arrived. Then appellant and the companion took the victims' bicycles, and the confrontation occurred.

3

Jaime M. testified appellant was about 5 feet 7 or 8 inches tall, and appellant had a little hair on his chin that he was continually stroking. Appellant had a thin mustache and short dark hair -- he was nearly bald. Jaime M. did not notice appellant had gang tattoos. Appellant was wearing a long, white oversized T-shirt, shorts that covered his knees and long white socks. He was light-skinned and Hispanic. At trial, Jaime M. was impeached with a statement he made at the robbery scene: Jaime M. claimed he did not know whether appellant had facial hair. Jaime M. also failed to describe the knife as a folding knife.

At trial, Steven Z. testified he could not estimate appellant's height, but appellant was "skinny." Appellant had "bald to really short hair." Steven Z. could not recall whether appellant had facial hair, and he did not believe appellant was wearing glasses.

At the preliminary hearing, Steven Z. identified appellant as one of the robbers but Jaime M. hedged concerning an identification during his preliminary hearing testimony. Jaime M. also testified that he was frightened about testifying at the preliminary hearing.

At trial, Jaime M. testified appellant was the robber who took his bicycle. At trial, Steven Z. initially testified he did not recognize appellant. Then, with further questioning, he acknowledged appellant was the robber who took Jaime M.'s bicycle.

(3) *Deputy Skahill's testimony.*

The prosecution had the investigating deputy, Los Angeles Deputy Sheriff Steven Skahill, a 23-year veteran deputy, testify. Deputy Skahill said that on the date of appellant's arrest, the deputy prepared and showed Jaime M. a computer-prepared, six-pack photographic display. Appellant's booking photograph was in the No. 2 position in the display. Jaime M. identified appellant as one of the robbers.

On September 12, 2011, Deputy Skahill had Steven Z. look at another copy of the same six-pack photographic display. Prior to the identification, the deputy had had each youth read the identification admonishments that were designed to be given before a six-pack display of photographs is shown to a witness. The deputy testified

4

that Steven Z. identified the photograph in the No. 2 position (the booking photograph of appellant) as the robber. The deputy had Steven Z. write on a copy of the six-pack display the specifics of his identification. Steven Z. wrote, "Guy No. 2 looks like the guy I saw. Not 100 percent sure." Then the deputy observed Steven Z. bend down closely to the photographic display, look at the No. 2 photograph in the display again through a frame made by his hands. Steven Z. then told the deputy that he was sure the No. 2 photograph depicted the robber who had yelled out, "Puente," pulled out a knife and took Jaime M.'s bicycle.

Deputy Skahill was asked to describe how he had prepared the six-pack photographic identification procedures. The deputy replied when appellant became a suspect in the robberies, he placed appellant's photograph into the computer-prepared photographic lineup. He did not assign appellant's photograph a particular slot in the display; that was what the computer program for preparing such displays did automatically.

The deputy explained the computer-generated program randomly selects 100 to 150 booking photographs of other persons of a similar description to that of perpetrator of the crime. Then a deputy manually selects five other similar-looking persons from those similar photographs selected by the computer. Sometimes if the deputy is investigating a suspect from a specific gang, he or she would use only photographs of similarly-aged youths from that same gang. In this case, from the deputy's remarks, it appeared he simply selected five other photographs from the group of photographs randomly selected by the computer without regard to gang affiliation.

The deputy said that upon meeting the witness, a deputy shows him or her the preprinted identification admonishments. He asks the witness to read the admonishments and whether the witness understands the admonishments. He solicits any questions concerning the admonishments. At that point, he shows the witness the six-pack photographic display. The deputy has the witness sign a copy of the six-pack display, circle the photograph of any photograph selected. Then the deputy has the

5

witness write the number of the photograph selected.  Under comments, if there are multiple suspects, the deputy asks the witness to describe in writing exactly what the person did during the commission of the crime.  The comments will distinguish the person identified from the other perpetrators.

Deputy Skahill explained during cross-examination that he did not interview Jaime M. and Steven Z. personally prior to preparing the six-pack photographic display.  He obtained a suspect description from the reports prepared on the night of the robbery.  He had been on duty that night and was aware the responding officer had obtained  "a really good physical description"  of the suspects.  He had concluded it was unnecessary to speak to the youths personally before using the computer to prepare the six-pack photographic display.

b.  *The defense.*

In defense, appellant's girlfriend testified to an alibi.  She claimed appellant was the father of her two young children and baby.  She said every night, by 7:00 p.m., appellant was at home assisting her with the care of their children.  The girlfriend acknowledged she and appellant ate out frequently and went to the same Jack-in-a-Box restaurant where the bicycles were stolen.  According to the girlfriend and appellant's mother, appellant is about 5 feet 3 inches tall and weighs approximately 125 to 130 pounds; he is "skinny."   Appellant has a lot of gang tattoos and never wears knee-height or long socks that might cover the numerous gang tattoos on his legs.

Appellant declined to testify on his own behalf.

In defense, trial counsel argued misidentification, emphasizing the occasions on which the youths failed to identify appellant or to give the deputies a description matching that of appellant.  Trial counsel also pointed out there was reasonable doubt as the reliability of the identification.  Inter alia, trial counsel argued the deputies never examined the surveillance tapes at the restaurant in an attempt to obtain an independent identification of the robbers.  Nor, after discovering appellant frequented that Jack-in-a-Box restaurant, did they ever attempt to identify appellant by speaking to the restaurant's employees.

6

In closing, trial counsel asked the jury, "[E]specially go to the testimony of [Deputy] Skahill, because I think he alone was the person most responsible for putting [appellant's photograph in the six-pack photographic display] in front of these two gentlemen. [¶] . . . [¶] What we do know, there was only one six-pack shown according to [Jaime M. and Steven Z.]. One six-pack. . . . There was never a series of photographs shown to these young men. There was never anything shown to these young men to indicate that maybe it could have been someone else."

2. *Case No. KA095862.*

In case No. KA095862, the probation report indicated that on April 28, 2011, West Covina police officers heard about six to eight gunshots and the screeching of tires. Appellant and two other occupants of a car then led police officers on a high speed vehicular pursuit. Appellant and his companions were apprehended after the car finally stopped. Its occupants then led the officers on a foot pursuit. Appellant's companions told the police appellant was the gunman. The police recovered the firearm, which appellant had discarded during the vehicle pursuit.

## DISCUSSION

1. *The rereading of testimony during deliberations.*

Specifically, appellant contends that in case No. KA095487, the trial court violated sections 977 and 1138 and committed reversible due process errors by failing to allow any defense presence at the readback of testimony during jury deliberations and by failing to obtain any waiver of appellant's personal presence during readback.

a. *Background.*

The trial court's minute orders show that the jury was excused to deliberate at 3:59 p.m. on June 13, 2012. It deliberated that day until 4:13 p.m., when the jury was excused for day.

After the trial court excused the jury for deliberations on June 13, 2014, the trial court ascertained the clerk had trial counsel's office and cellular telephone numbers. It asked trial counsel to inform its clerk concerning his schedule for the following day. Trial counsel inquired concerning readback "and that kind of thing." The trial court

7

cited trial counsel to the decisions in *People v. McCoy* (2005) 133 Cal.App.4th 974 (*McCoy*), *People v. Cox* (2003) 30 Cal.4th 916 (*Cox*)[2] and *People v. Ayala* (2000) 23 Cal.4th 225 (*Ayala*) and indicated the rereading of testimony during jury deliberations was not a critical stage of the proceedings. The trial court explained that its statutory obligations extended only to notifying the parties concerning the issues raised by the jury, and it said it intended to see that that was done.

The trial court further explained it was its custom to notify trial counsel if the jury makes an inquiry. In the event of a jury inquiry, the trial court writes down its proposed reply to the inquiry. The clerk then contacts trial counsel and informs trial counsel concerning the inquiry and the trial court's proposed reply. At that point, trial counsel may raise any objections he wishes and relay any proposed changes to the clerk, who in turn, notifies the trial court and the prosecutor. If there are differences of opinion, they attempt to work it out over the telephone, and barring a resolution, everyone appears in person in court for an on-the-record hearing.

At 9:02 a.m., the following day, June 14, 2012, jury deliberations resumed. At 10:30 a.m. on June 14, 2012, the jury submitted a question, requesting clarification of the printing at the bottom of the six-pack photographic display and a definition of robbery. According to the trial court's minutes, the prosecutor and trial counsel were contacted and agreed to the trial court's proposed reply to the jury's inquiry, and it was sent to the jury. The trial court replied to the jury in writing, "The Evidence is what you have including any testimony about it," and "See paragraph 2 of instr.[uction] [No.] 9.40."

The trial court's minutes reflect that 10 minutes after obtaining the trial court's reply, at 10:45 p.m. on June 14, 2014, the jury asked for the rereading of Deputy Skahill's testimony. The June 14, 2004, minute order indicates that at 11:04 a.m., the

---

2    The decision in *Cox, supra*, 30 Cal.App.4th 916 was overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.

court reporter entered the jury room to readback the requested testimony. She exited the jury room at 11:21 a.m.

The jurors broke for lunch between noon and 1:32 p.m. At 1:53 p.m. that day, the jury buzzed indicating that it had reached a verdict. At 2:43 p.m., the verdicts were read to appellant in his presence and that of trial counsel.

The reporter's transcript of the proceedings of the return of the verdicts discloses that trial counsel raised no objection to the trial court's procedures concerning replying to jury's questions and its request for the reading of testimony during deliberations.

At the next court appearance, on December 13, 2012, the parties concerned themselves with the results of their plea negotiations. Trial counsel made no record concerning any objections appellant had to the trial court's procedures during deliberations.

b. *The legal principles regarding a defendant's presence at the proceedings.*

"A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code." (*People v. Waidla* (2000) 22 Cal.4th 690, 741 (*Waidla*).)

While a criminal defendant has the right to be present at all critical stages of trial (*Rushen v. Spain* (1983) 464 U.S. 114, 117), the United States Supreme Court has never declared the readback of testimony to be a critical stage of the proceedings. (*People v. Butler* (2009) 46 Cal.4th 847, 865 (*Butler*) [defendant not present during readback of testimony, a discussion of jury instructions and telephonic discussion with trial counsel on supplemental instruction on the definition of "possession"]; *Cox, supra,* 30 Cal.4th at p. 963; *Ayala*, *supra*, 23 Cal.4th at p. 288; *People v. Horton*

9

(1995) 11 Cal.4th 1068, 1120; *McCoy, supra*, 133 Cal.App.4th at pp. 981-983 & fn. 5.)  The accused only has a right " 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " (*McCoy, supra*, 133 Cal.App.4th at p. 982, citing *Kentucky v. Stincer* (1987) 482 U.S. 730, 745.)

Under state law, the lack of a defendant's presence during criminal proceedings becomes a denial of due process only when his presence will be useful or of benefit to him and his counsel, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial.  (Cal. Const., art 1, § 15; *People v. Bloyd* (1987) 43 Cal.3d 333, 359-360; see also § 1043.)  A defendant has no right to be present where his presence bears no " ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' [Citations.]"  (*People v. Jackson* (1980) 28 Cal.3d 264, 309, overruled on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901 & fn. 3.)

Our own Supreme Court has held that ordinarily the readback of testimony is not a critical stage of the proceedings requiring a defendant's presence.  (*Butler, supra*, 46 Cal.4th at p. 865; *Cox, supra*, 30 Cal.4th at p. 963; *People v. Medina* (1990) 51 Cal.3d 870, 902-903.)

Section 977 provides in pertinent part, as follows:

"(b)(1) In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence.  *The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present*, as provided by paragraph (2).  If the accused agrees, the initial court appearance, arraignment, and plea may be by video, as provided by subdivision (c).  [¶]  (2) The accused may execute a written waiver of his or her right to be personally present, approved by his or her counsel, and the waiver shall be filed with the court. . . ."  (Italics added.)

10

Section 1043, subdivision (a), provides: "(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial."

Sections 977 and 1043 of the Penal Code do not grant a defendant the right to be personally present, nor is the trial court required to obtain a written waiver from him, where he does not have such a right under section 15 of article I of the California Constitution. (*Waidla, supra*, 22 Cal.4th at p. 742; see also, *People v. Bradford* (1997) 15 Cal.4th 1229, 1357; accord, e.g., *People v. Jackson, supra*, 28 Cal.3d at pp. 308-309 (plur. opn. of Richardson, J.)

In sum, to demonstrate error on grounds of a lack of presence, appellant must show his personal presence "*either* was *necessary* for an 'opportunity for effective cross-examination,' for purposes of the Sixth Amendment's confrontation clause (*Kentucky v. Stincer, supra*, 482 U.S. at pp. 744-745, fn. 17); or would have 'contribute[d]' to the trial's 'fairness' *in any marginal way*, for purposes of the Fourteenth Amendment's due process clause (*Kentucky v. Stincer, supra*, 482 U.S. at p. 745); or bore a ' " ' "reasonably *substantial* relation to the fullness of his opportunity to defend," ' " ' for purposes of section 15 of article I of the California Constitution and also sections 977 and 1043 of the Penal Code [Citation.]" (*Waidla, supra*, 22 Cal.4th at p. 742.)

Mere speculation concerning how a defendant's presence at the proceedings would have assisted his defense does not demonstrate error. (*Waidla, supra*, 22 Cal.4th at p. 742.)

      c. *Section 1138.*

Section 1138 provides:

"After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. *Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called.*" (Italics added.)

Section 1138 has been interpreted to mean that defendant and his counsel not only must be given notice of any proceedings during the deliberative process. It also affords the defense the right, once so notified, to be present and to have an opportunity to have meaningful input into the court's response to a jury inquiry. (*People v. Garcia* (2005) 36 Cal.4th 777, 802 (*Garcia*); *People v. Jenkins* (2000) 22 Cal.4th 900, 1026-1027.)

        d. *The analysis.*

Ordinarily, there is no constitutional right to be present during the readback of testimony. None of the circumstances here leads us to reach a different conclusion. Despite any notation in the minutes, this court must assume the trial court followed through with its usual procedure and contacted trial counsel concerning the rereading of the testimony. "The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) On this silent record, we must presume trial counsel was contacted about the readback of testimony.

Appellant's arguments that identification was a critical issue at trial and that defense counsel had directed the jury to review Deputy Skahill's testimony carefully, which the jury apparently did, fail to demonstrate specific facts leading to a conclusion appellant's presence would have assisted his defense. This jury reached a verdict in a record amount of time, in a few hours. We decline to speculate there was *Watson* or *Chapman* error in this case that would require a reversal. (*Waidla, supra,* 22 Cal.4th at p. 742; *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 23.)

Insofar as the decision in *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906 overruled on other grounds by *Payton v. Woodford* (9th Cir. 2003) 346 F.3d 1204, 1217 (en banc), overruled by *Brown v. Payton* (2005) 544 U.S. 133 [161 L. Ed. 2d 334], may support appellant's contention, we decline to follow the decision. This court is not bound by decisions of the lower federal courts, even on federal questions.

12

(*People v. Crittenden* (1994) 9 Cal.4th 83, 120 & fn. 3; *People v. Burton* (1989) 48 Cal.3d 843, 854; *People v. Bradley* (1969) 1 Cal.3d 80, 86.)

The decisions in *People v. Frye* (1998) 18 Cal.4th 894, 1007 (*Frye*), overruled on other grounds in *People v. Doolin, supra*, 45 Cal.4th at p. 421, and *Garcia, supra*, 36 Cal.4th at p. 801, are distinguishable on their facts. The decision in *Frye* involved a trial court's denial of the *jury's* right to have testimony reread during deliberations. Here, the trial court complied with the jury's request. (*Frye, supra*, at pp. 1007-1008.) And the appellate court found even if there was section 1138 error, it was harmless. In *Garcia*, the trial court barred the defendant and his counsel from attending a return visit to the crime scene requested by the jury during deliberations, and the California Supreme Court held section 1138 afforded the defendant and his counsel a right to be present during any jury view of the crime scene. (*Garcia, supra*, 36 Cal.4th at pp. 801-803.)

      2. *Section 2900.5 Credit.*

Appellant contends the trial court miscalculated his actual days of custody credit, and he is entitled to two additional days of custody credit.

At sentencing, appellant was granted section 2900.5 presentence credit of 460 days of custody credit and 69 days of conduct credit, for a total of 529 days of credit.

The attorney general concedes the contention has merit. Appellant was arrested on September 9, 2011 and sentenced on December 13, 2012. Thus, he is entitled to 462 days of custody credit. (*People v. Smith* (1989) 211 Cal.App.3d 523, 525-526.) Commensurate with the 462 days of custody credit, his conduct credit for that period measured at 15 percent and is 69 days. (*People v. Ramos* (1996) 50 Cal.App.4th 810, 818-821.)

Accordingly, we will modify the judgment to award appellant the appropriate custody credit.

## DISPOSITION

The judgment in case No. KA095487 is modified to award appellant 531 days of presentence section 2900.5 credits, consisting of 462 days of custody credit and 69 days of conduct credit.

In all other respects, the judgments are affirmed.

The superior court shall have its clerk prepare and send new, amended abstracts of the judgments to the California Department of Corrections and Rehabilitation showing the award of two additional days of section 2900.5 custody credit.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

14